**FILED**
U.S. DISTRICT COURT
EASTERN DISTRICT ARKANSAS

FEB - 3 2003

JAMES W. McCORMACK, CLERK
By:_____
DEP CLERK

# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

No. 01-2755  *4:99 CV 00611*

| | |
|---|---|
| Jimmy Manus, Individually, and as parent and next friend of Emily Manus, a minor and Lauren Manus, a minor; Stephanie Manus, individually, and as parent and next friend of Emily Manus, a minor and Lauren Manus, a minor, | * * * * * * * |
| Appellees, | * * |
| v. | * * |
| American Airlines, Inc., | * * |
| Appellant. | * |

Appeal from the United States District Court for the Eastern District of Arkansas.

Submitted: January 17, 2002

Filed: January 9, 2003

Before WOLLMAN,[1] Chief Judge, RICHARD S. ARNOLD, and HANSEN, Circuit Judges.

WOLLMAN, Chief Judge.

---

[1] The Honorable Roger L. Wollman stepped down as Chief Judge of the United States Court of Appeals for the Eighth Circuit at the close of business on January 31, 2002. He has been succeeded by the Honorable David R. Hansen.

American Airlines (American) appeals from the judgment entered on the jury verdict in favor of Stephanie, Lauren, and Emily Manus (collectively, the Manuses) in their action for damages resulting from the crash of American's Flight 1420 in Little Rock, Arkansas, on June 1, 1999.[2] American did not contest its liability for compensatory damages, leaving only the amount to be determined by the jury. After a five-day trial, the jury awarded Stephanie $2,000,000 for her pain and suffering and lost earning capacity; $35,000 and $18,000 to Lauren and Emily for their respective medical costs; and $800,000 to Lauren and $500,000 to Emily for their respective pain and suffering. Following the entry of the verdict, the district court[3] denied American's renewed motion for judgment as a matter of law, its motion for a new trial, and its alternative motion for remittitur. We affirm.

## I.

The Manuses boarded Flight 1420 from Dallas, Texas, to Little Rock, Arkansas, as the second and final leg of their return home after visiting family in Phoenix, Arizona. They were seated in row twenty-four, two rows behind an emergency exit row. At the time of the crash, Lauren was four and Emily was two. The flight was delayed at least twice and did not approach Little Rock until almost midnight on June 1. The plane touched down in a raging thunderstorm. Instead of decelerating in a normal fashion, the plane ran off the runway and came to a stop only after striking an electrical stanchion and breaking into three pieces. The body of the plane split open between rows eighteen and nineteen, and the left wing was completely detached from the body of the airplane. Jet fuel from the detached wing spilled into the fuselage and caught on fire.

---

[2] Jimmy Manus's loss of consortium claim was voluntarily dismissed.

[3] The Honorable Henry Woods, late a United States District Judge for the Eastern District of Arkansas.

After the plane came to a stop, Stephanie released her and the girls' seat belts, picked up Emily, grasped Lauren's hand, and looked out into the aisle. Seeing fire coming from the rear, she moved out into the aisle and began to make her way forward toward the exit row located at row twenty-two. Because the aisle was littered with debris, she immediately encountered problems keeping hold of Lauren. Passenger Arnold Bowden testified that as he was trying to navigate the aisle he came across a small child trying to crawl through the debris. He picked the child up, carried her to the emergency exit over the right wing, and handed her through the window to another passenger, Charles Fuller, who was outside on the wing assisting passengers as they exited the aircraft. Fuller immediately passed the child off to another passenger, who took the girl away from the plane. Fuller testified that he heard a passenger calling out repeatedly, "Save my babies."

Meanwhile, Stephanie encountered an elderly man who had fallen in the aisle and who was calling for help. Although desirous of helping the fallen passenger, who reminded her of her grandfather, Stephanie, whose arms were wrapped around Emily, was unable to pause to do so. Guided by the light from the burning fuel, Stephanie continued down the aisle until she reached the emergency exit, where she and Emily were able to escape from the aircraft. Stephanie walked down the length of the wing searching for a place that was close to the ground. She then sat down on the wing and slid off onto the ground. After reaching the ground, she sought out and found Lauren, who was with the passenger who had taken her from Fuller. She and the girls moved away from the plane and waited for rescue workers to arrive. Stephanie then borrowed a cell phone from a passenger and called her husband to let him know that they were still alive.

Stephanie testified that her experiences outside the aircraft were just as harrowing as those inside. The thunderstorm continued to rage, leaving Stephanie and her daughters soaked by the rain, exposed to the thunder and lightning, and pelted by larger than golf-ball-size hail. As the three moved away from the plane, Stephanie

experienced pain in her left knee and lower back. Both Lauren and Emily were crying, and repeatedly asked where their father was. While she and her daughters waited, Stephanie heard screams coming from inside the airplane and witnessed severely burned passengers who had escaped the wreckage. With renewed fears that the airplane might explode, Stephanie led her daughters even farther from the wreckage, walking through a swampy area to do so.

Eventually the Manuses were transported to the airport fire station. From there, still clad in their wet clothes, they were taken to a theater that was used as a triage site from which passengers were transported to area hospitals. Stephanie's knee and back pain became so severe that she was transported to a hospital by ambulance. She was treated and released, and the family returned home at daybreak.

Following the crash, Stephanie, Lauren, and Emily were diagnosed as suffering from post-traumatic stress disorder (PTSD). In addition, Stephanie has been diagnosed as suffering from major depression. Her symptoms include nightmares, flashbacks, self-imposed insomnia, bouts of crying, and episodes in which she has locked herself in the bedroom or bathroom. She continues to see Joan Hemingway, a psychotherapist, for counseling and Dr. Charles Lewis, a psychiatrist, for periodic review and medication. Stephanie has been prescribed numerous medications for her symptoms, and at the time of trial she was taking Zoloft, an antidepressant.

Stephanie's physical injuries included an injury to her knee that required arthroscopic surgery. Her treating physician testified that this injury resulted in a five-percent permanent impairment resulting in weakness, swelling, limited range of motion, and pain. He also testified that the impairment would make it difficult for Stephanie to squat or kneel. At the time of trial, Stephanie continued to take a prescription drug to relieve the pain in her knee.

Lauren and Emily share some common post-accident symptoms, such as nightmares and fear of planes and thunderstorms. Additionally, Lauren has exhibited extended grief over the loss of a doll she brought with her on the plane and adverse reactions to school fire drills and fire safety instruction, while Emily went through a period during which she rejected her father and subjected the family cat to abuse. At the time of trial, both girls were receiving weekly therapy from a psychological examiner.

## II.

American appeals the district court's denial of its motion for judgment as a matter of law, arguing that the evidence of Stephanie's lost earning capacity was insufficient to create a jury question. We review a district court's denial of a motion for judgment as a matter of law de novo, employing the same standard as the district court. Belk v. City of Eldon, 228 F.3d 872, 877 (8th Cir. 2000). "Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining the position of the nonmoving party." Id. at 877-78 (internal quotes and citations omitted). We view the facts in the light most favorable to the non-movant. Id. at 877.

Arkansas law recognizes that where an "injury is permanent, proof of specific pecuniary loss is not indispensable to recovery." Coleman v. Cathey, 565 S.W.2d 426, 429 (Ark. 1978); see also Gipson v. Garrison, 824 S.W.2d 829, 831-32 (Ark. 1992).

> Damage resulting from loss of earning capacity is the loss of the ability to earn in the future. The impairment of the capacity to earn is the gravamen of the element. Proof of this element does not, however, require the same specificity or detail as does proof of loss of future wages. The reason is that the jury can observe the appearance of the plaintiff, his age, and the nature of the injuries that will impair his

capacity to earn. A serious or permanent injury may sustain the submission of the issue of loss of earning capacity to the jury. . . . Thus, the relevant inquiry is whether there was some evidence of [the plaintiff's] loss of earning capacity.

Edwards v. Stills, 984 S.W.2d 366, 385 (Ark. 1998) (citations omitted).

Stephanie's treating physicians testified regarding her permanent physical injury, and mental health professionals testified that her chronic PTSD is a permanent condition. In addition, there was evidence that Stephanie's physical injury prevents her from pursuing employment as a cosmetologist, a job for which she is trained and licensed. The evidence also revealed that Stephanie was poised to become a travel agent. She testified that she had taken travel agent training, ordered business cards, made up a list of contacts, and was slated to begin work on the Monday after the crash. She testified that she was not able to follow through with her plans because she would never be able to live with herself if a customer suffered injury or death on a trip she had booked. She further testified that, given their post-crash emotional problems, she needed to be available to her daughters. She gave the latter explanation as the reason for her inability to enter the work force at any job for the foreseeable future.

American contends that there is no evidence that Stephanie was incapable of working in other jobs that are available to a person of her educational level. Arkansas law, however, does not require such proof. In Gipson, 824 S.W.2d at 832, the Arkansas Supreme Court upheld an award for loss of earning capacity, based upon evidence that the plaintiff had suffered a five-percent disability and was forced to forego her career as an interior designer and to liquidate her business. Similarly, in Coleman, 565 S.W.2d at 428-29, the court held as adequate to support an award of damages for loss of earning capacity the plaintiff's testimony that he had lost the ability to coach college basketball, notwithstanding the fact that there was no

evidence that he was earning less than he had been when he was terminated from his coaching position.

American also argues that the testimony of Dr. Ralph Scott, plaintiffs' economist, was speculative and thus did not support the verdict. Dr. Scott testified as to the earning capacities of cosmetologists, travel agents, and high school graduates. He stated that travel agents and high school graduates have approximately the same earning capacity, and that cosmetologists have 60% of the earning capacity of travel agents. He presented the jury with three figures. The first was based on the value of the loss between the accident and trial. The second was the present value of the lost earning capacity of a travel agent for twenty-one years at full-time employment. The third was half the total of the second, which took into account the possibility that Stephanie might reenter the work force after approximately ten years or that she might work at 50% productivity. Dr. Scott also testified that if the jury wished to reduce the figure to an amount appropriate for a cosmetologist's earning capacity, it could multiply the figures by 60%. Thus, because Dr. Scott's testimony presented the jury with alternative earning capacity calculations from which it could determine the extent of the impairment to Stephanie's earning capacity that resulted from the crash, it was sufficiently detailed to support the award.

Although we are inclined to agree with the district court's observation that the evidence of Stephanie's loss of earning capacity "was not particularly strong," we conclude that it is not materially weaker than the evidence presented in Gipson and Coleman. Accordingly, the district court did not err in denying the motion for judgment as a matter of law on the issue of loss of Stephanie's earning capacity.

### III.

American contends the district court erred in denying its motion for new trial, or in the alternative, for remittitur.

We review the district court's denial of the motion for new trial or for remittitur for abuse of discretion. Lloyd v. Am. Airlines, Inc., 291 F.3d 503, 509 (8th Cir. 2002) (citing Van Steenburgh v. Rival Co., 171 F.3d 1155, 1160 (8th Cir. 1999)). "In reviewing the district court's decision, we give great deference to its judgment, because the district court has the benefit of hearing testimony and observing the demeanor of the witnesses throughout the trial." Bonner v. ISP Techs., Inc., 259 F.3d 924, 932 (8th Cir. 2001) (citing Sanford v. Crittenden Mem'l Hosp., 141 F.3d 882, 884 (8th Cir. 1998)).

We apply state substantive law to determine whether an award is excessive. See Schaefer v. Spider Staging Corp., 275 F.3d 735, 737-38 (8th Cir. 2002) (citing Gasperini v. Ctr. for Humanities, 518 U.S. 415, 426-38 (1996)). Under the Arkansas standard, a verdict is excessive where "the award is so great that it shocks the conscience of the court or demonstrates that the trier of fact was motivated by passion or prejudice." Peoples Bank & Trust Co. v. Globe Int'l Publ'g, Inc., 978 F.2d 1065, 1070-71 (8th Cir. 1992).

"A motion for new trial is appropriately granted if the verdict is against the weight of the evidence and if allowing it to stand would result in a miscarriage of justice." Lloyd, 291 F.3d at 508-09. "On a motion for new trial, the district court is entitled to interpret the evidence and judge the credibility of witnesses, but it may not usurp the role of the jury by granting a new trial simply because it believes other inferences and conclusions are more reasonable." Van Steenburgh, 171 F.3d at 1160 (citing White v. Pence, 961 F.2d 776, 780-81 (8th Cir. 1992)).

### A.

American first argues that the awards are excessive as a matter of law. We disagree. The majority of the cases American cites are inapposite, as they do not involve a precipitating event that compared with the plane crash experienced by the

Manuses. In any event, the mere existence of lesser verdicts does not invalidate the awards to the Manuses. See Morrissey v. Welsh Co., 821 F.2d 1294, 1301 (8th Cir. 1987) (although comparison can be helpful, each award is judged on its own merits); St. Louis Southwestern Ry. Co. v. Grider, 900 S.W.2d 530, 535 (Ark. 1995) (Arkansas places little reliance on prior awards).

Stephanie testified as to the fear she felt during the crash, both for her life and for the lives of her daughters. She testified how she had lost track of Lauren because she could not carry Emily and hold Lauren's hand at the same time, and she recounted her struggle to find her lost daughter, who had been evacuated from the plane by other passengers. She testified that the girls cried continuously and asked for their father repeatedly, and she described how she could hear the screams of those passengers still trapped in the plane. Finally, she testified how, following their escape from the burning plane, she and the girls were subjected to the storm's wrath as they slogged through a swamp to what she hoped would be a zone of safety sufficiently distant from what she feared might be an exploding aircraft.

It was for the jury to determine the amount that it felt would adequately compensate Stephanie and her daughters for the terror they experienced during and immediately after the crash itself, as well as for the post-crash trauma they have suffered and will continue to suffer. Although the amounts awarded may well represent the outer limit of that supported by the evidence, we cannot say that the experienced district court abused its discretion by ruling that the verdicts were not excessive as a matter of law.

### B.

Next, American argues that the awards to the Manuses are excessive in relation to their injuries. As we stated above, we give great deference to the district court's ruling on a motion for new trial, and we may not reverse simply because the jury drew

inferences or reached conclusions that are different from those we might have made in the first instance.

American isolates individual pieces of testimony and relies upon them to argue that the verdict overcompensates the Manuses for their injuries. For example, American points to the testimony of Joan Hemingway, Stephanie's psychotherapist, who stated that because of her own PTSD, Stephanie cannot clearly evaluate the girls' progress. The jury heard testimony from no fewer than five people about the effect of the crash on Lauren's and Emily's psyches, and Ms. Hemingway pointed out that Stephanie "sees things at home that other people don't see." The jury witnessed Stephanie's demeanor on the stand and was thus in a position to determine whether she was an overwrought mother who tended to exaggerate her daughters' emotional states.

Likewise, we question American's characterization of certain pieces of testimony. For example, in questioning Dr. Patricia Youngdahl, a child psychologist who evaluated Lauren and Emily, American inquired about the diagnostic tool she utilized to evaluate the girls. On axis three, Dr. Youngdahl wrote "healthy" for both Lauren and Emily. Both Dr. Youngdahl and Dr. Lewis testified that axis three relates to physical health, not mental or emotional health. Yet, in representing Dr. Youngdahl's opinion to other witnesses and in briefing to this court, American relies on the word "healthy" from Dr. Youngdahl's evaluation as a descriptor of Lauren's and Emily's present and future mental and emotional health.

Additionally, American argues that "all of the Manuses' treating experts felt that their best case scenarios are probable." To the contrary, when Stephanie's treating psychiatrist, Dr. Lewis, testified about future medical costs Stephanie might incur, he stated that his best case scenario would hold true only if everything in Stephanie's life went "great, and she doesn't run into any big bumps." He then predicted that Stephanie would have an "average stressful life," and that while he

could not predict exactly what stressors she would face, with an average amount of stress she would incur treatment costs of approximately $20,000.

American seeks to minimize the extent of Stephanie's knee injury, pointing out that it has resulted in only a five-percent impairment. There was testimony, however, indicating that despite continued medication Stephanie's knee swells and is painful enough to prohibit her from squatting or kneeling, making it difficult for her to pick up her children. Moreover, Stephanie cannot expect to return to work as a cosmetologist, and she no longer can engage in the same kind of exercise or the leisurely walks in which she previously had taken pleasure.

Finally, American argues that the outlook for the Manuses is positive. Just as it strives to minimize the experience of the crash, so too does American minimize the consequences of the crash on the lives of the Manuses during the period between the crash and trial. By admitting liability, American acknowledged its obligation to compensate the Manuses for their injuries. As detailed above, the Manuses presented substantial evidence regarding the effects of the crash. Each has been diagnosed with PTSD, and each has experienced nightmares and flashbacks. Stephanie suffers from a major depression. Lauren and Emily continue to be frightened of airplanes and thunderstorms. Lauren, more than a year after the crash, panicked during a fire drill and was distrustful of fire safety instruction. For a time, Emily rejected her father, exhibited destructive behavior, and abused the family pet.

The arid language of an appellate opinion does poor service in conveying the emotion that was very likely expressed during Stephanie Manus's account of the mind-numbing terror she and her daughters experienced as they sought to escape the burning aircraft and to seek refuge from the storm that brought their journey to such a traumatic, life-threatening end. It was for the jury, able as it was to judge the credibility of that account, to determine the extent of the terror and pain that the Manuses experienced and the likely extent to which they will continue to suffer from

the trauma, physical and emotional, that resulted from the late-night crash. Accordingly, the district court did not err in rejecting American's contention that the injuries suffered by the Manuses do not support the jury's verdict.

### C.

Last, American argues that the awards to Stephanie and the girls for future medical expenses are excessive because they were based on speculative expert testimony.

Without recounting the testimony on this issue, we conclude that the awards, although undoubtedly at the outer limits of that warranted by the evidence, are not so devoid of evidentiary support as to require reversal. Again, we place great credence in the on-the-scene observations of the district court, which found that the awards for future medical treatment had an adequate basis in the evidence.

The judgment is affirmed.

A true copy.

    Attest:

        CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.